UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
THEODORE DRAKE, *pro se*,      :
                               :
                    Plaintiff, :
                               :
        -against-              :           **OPINION AND ORDER**
                               :            15-CV-5604 (DLI)
COMMISSIONER OF SOCIAL SECURITY, :
                               :
                    Defendant. :
---------------------------------------------------------x
**DORA L. IRIZARRY, Chief United States District Judge:**

On November 10, 2011, Theodore Drake ("Plaintiff") filed an application for Supplemental Security Income ("SSI") benefits under the Social Security Act, alleging disability beginning May 1, 2007.[1] *See* Certified Administrative Record ("R."), Dkt. Entry Nos. 10-11 at 60. Plaintiff's application was denied on December 3, 2011 (*Id.* at 61), and he timely requested a hearing before an Administrative Law Judge ("ALJ") (*Id.* at 84-88). On June 18, 2013, Plaintiff appeared *pro se* before ALJ Edward H. Hein. *Id.* at 45-59. The ALJ adjourned the hearing so that Plaintiff could attempt to obtain counsel and additional medical records supporting his claims. *See Id.* at 51. On October 10, 2013, the ALJ continued the hearing, and Plaintiff, who failed to take any steps to obtain counsel, testified *pro se*. *Id.* at 20-43. On August 8, 2014, the ALJ issued a decision finding that Plaintiff was not disabled. *Id.* at 6-19. On July 21, 2015, the ALJ's decision became final when the Appeals Council denied Plaintiff's request for review. *Id.* at 1-3, 198, 308-309.

On September 23, 2015, Plaintiff filed this appeal seeking judicial review of the Commissioner's denial of benefits pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *See* Compl. at ¶ 1. The Commissioner of Social Security ("Commissioner" or "Defendant") moved

---

[1] While Plaintiff's Social Security benefits application alleges disability beginning May 1, 2007, Plaintiff's Complaint alleges that his disability began in June 2007. *See* Complaint ("Compl."), Dkt. Entry No. 1 at ¶ 5.

for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). *See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s. Mem."), Dkt. Entry No. 22. Plaintiff filed a brief opposition to Defendant's motion, consisting only of a "Disability Impairment Questionnaire" and a tenant occupancy form. *See* Pl.'s Opp'n to Def.'s Mot. for J. on the Pleadings ("Pl.'s Opp'n"), Dkt. Entry No. 23. For the reasons set forth below, the Commissioner's motion is granted and the instant appeal is dismissed.

## BACKGROUND[2]

**A.     Non-Medical and Self-Reported Evidence**

Plaintiff was born in 1965 and was 48 years old when the ALJ issued his decision.[3] R. at 126. Plaintiff has an eleventh grade education, and speaks, writes, and reads English. *Id.* at 146. Plaintiff worked for a shipping company in 1983 and 1984, and also as a furniture store stock clerk in 1987, but has not worked "on the books" since 1987. *See Id.* at 28-32, 126. In May 2007, Plaintiff was diagnosed with heart and lung conditions. *Id.* at 126

In a disability report dated November 28, 2011, Plaintiff reported that he was five feet eleven inches tall and weighed 160 pounds. *Id.* at 147. He reported that he stopped working on December 30, 1987 "[b]ecause of [his] condition(s) and other reasons," including that the "store [employing him had] closed." *Id.* Though Plaintiff stopped working in 1987, he reports that his conditions became severe enough to prevent him from working beginning on May 1, 2007. *Id.* The disability report lists six medical conditions from which Plaintiff suffers: a heart condition, lung problems, shortness of breath, hypertension, numbness in the hands, and high cholesterol. *Id.*

---

[2]     Having thoroughly and carefully reviewed the administrative record, the Court finds the Commissioner's factual background accurately represents the relevant portions of the record. Accordingly, the background information that follows is taken substantially from the "Administrative Record" section of the Commissioner's motion.

[3]     As such, Plaintiff was a "younger person" as defined in 20 C.F.R. § 404.1563(c).

Plaintiff's function report dated December 12, 2011 notes that he lives in an apartment with his family. *Id.* at 162. Plaintiff reports no issues with personal care, and he does not care for anyone else or any animals in the home. *Id.* at 163-64. Plaintiff's family prepares his meals because he is "not good at it," but he will "try" to prepare meals if he has to. *Id.* at 164. Plaintiff cleans and does household repairs, but needs help with these things if he gets tired or experiences shortness of breath. *Id.* at 165, 172. Plaintiff reports going outside "almost every day," except when he is "not feeling too good." *Id.* at 165. He walks, rides in the car, or uses public transportation to get around, and he is able to go out of the house alone. *Id.* Plaintiff does not have a driver's license. *Id.* at 166. Plaintiff reports being able to count change, but he is unable to pay bills or handle a savings account, though these inabilities existed before the onset of his alleged disabilities. *Id.* Plaintiff's hobbies include watching television, which he does when he is tired and needs to rest. *Id.* He reports that he does not "go out much or socialize," though he has no problems doing so, and he includes socializing and walking as daily activities. *Id.* at 167, 172.

In terms of physical limitations, Plaintiff reports that he cannot lift things like he used to because he experiences shortness of breath and feels as if he will pass out. *Id.* at 167. He also cannot stand as long as he used to be able to stand, nor can he walk as far as he used to be able to "unless [he] take[s] [his] time." *Id.* at 167-68. Plaintiff reports that he can walk approximately two blocks before having to rest for approximately five minutes before continuing. *Id.* at 169. Plaintiff can climb approximately two flights of stairs before having to rest, and reports feeling lightheaded and experiencing blurred vision when standing up from kneeling and squatting. *Id.* at 168. He reports no problems reaching as long as he is not reaching too high or for too long, though he reports cramps and numbness in his hands, and that his hands sometimes "lock up." *Id.* Plaintiff has no trouble with authority figures and no difficulty following written or spoken instructions or

paying attention. *Id.* at 169. He reports no trouble remembering things. *Id.* at 170. Plaintiff takes medication for his conditions, including folic acid, Lipitor, Lisinopril, Metoprolol, and Thiamine. *Id.* at 181.

B.  **Medical Evidence before the ALJ**

   *1. Brooklyn Hospital*

Plaintiff's medical records cover the period from 2007 through 2013 and consist of progress notes from his treating physicians, Sawsan Al-Izzi, M.D., Joseph Abboud, M.D., and other staff doctors at Brooklyn Hospital, as well as results from an echocardiogram, exercise stress test, cardiac catheterization, EKG, and pulmonary function test. *See Id.* at 199-223, 229-31, 233-87.

Plaintiff's earliest record is an April 2007 pre-operative evaluation for general anesthesia performed at Brooklyn Hospital,[4] where he presented with a history of gastritis, hypercholesterolemia, and left ventricular hypertrophy ("LVH"). *Id.* at 200. Plaintiff was not suffering from shortness of breath, chest pain, or respiratory distress, and his doctor requested an electrocardiogram ("EKG" or "ECG"). *Id.* The EKG was abnormal, showing sinus bradycardia, voltage criteria for left ventricular hypertrophy, and early repolarization. *Id.* at 219.

In May 2007, Plaintiff returned to Brooklyn Hospital with complaints of shortness of breath when going up stairs and walking for more than two blocks. *Id.* at 203. Plaintiff's lungs were clear to auscultation and percussion, and his physical examination findings were unremarkable. *Id.* The doctor noted Plaintiff had chronic gastritis, a history of alcohol abuse, hypercholesterolemia, and Plaintiff smoked up to one pack of cigarettes per day. *Id.* The doctor

---

[4]   Brooklyn Hospital is the only treating source Plaintiff reported. *See* R. at 24-28.

noted that Plaintiff "needs to stop drinking" and that "smoking cessation [was] explained." *Id.* He recommended a stress test, which was negative for myocardial ischemia. *Id.* at 203, 220.

Plaintiff returned to Brooklyn Hospital on June 13, 2007. *Id.* at 201. The doctor noted that Plaintiff was "still drinking," and Plaintiff had LVH and a decreased ejection fraction rate. *Id.* The doctor scheduled a cardiology consultation for June 22, 2007 regarding a cardiac catheterization. *Id.* On July 11, 2007, Plaintiff again returned to Brooklyn hospital, and his doctor noted that Plaintiff was still considering cardiac catheterization. *Id.* at 202.

In October 2007, Plaintiff received a cardiac catheterization. *Id.* at 204, 221-22. He returned to Brooklyn Hospital in November 2007 for the results of the procedure, which showed normal coronary arteries, mild left ventricular dysfunction, and an ejection fraction rate of 45%. *Id.* Plaintiff then underwent an echocardiogram in May 2009, which revealed normal findings, with the exception of mild mitral and tricuspid regurgitation. *Id.* at 223. The echocardiogram showed an ejection fraction rate of 59%. *Id.* Plaintiff again underwent EKG testing in August 2009, which again showed sinus bradycardia, voltage criteria for LVH, early repolarization, and abnormal results. *Id.* at 218. During this period from 2007 to 2009, Plaintiff attended several follow-up medical appointments where his doctors noted unremarkable physical examination findings and unchanged diagnoses. *See Id.* at 205-11, 213-16.

In February 2011, Plaintiff underwent a third EKG, which was unchanged from his previous EKG in August 2009. *Id.* at 217. Plaintiff received a chest x-ray in February 2012 that showed no acute pulmonary disease. *Id.* at 281. In September 2012, as a result of Plaintiff's chronic complaints of memory loss, Plaintiff underwent a computerized tomography ("CT") scan of his head, which revealed no intracranial hemorrhage or acute pathology. *Id.* at 283.

Plaintiff returned to Brooklyn Hospital on June 3, 2013. *Id.* at 258-63. Dr. Al-Izzi again noted that Plaintiff had a history of hypertension, non-ischemic cardiomyopathy (alcoholic), chronic gastritis, and hypercholesterolemia. *Id.* at 259. The doctor noted that Plaintiff's hypertension was controlled, his non-ischemic cardiomyopathy (alcoholic) was "stable and asymptomatic," and requested a follow up in three months. *Id.* at 261-62.

On August 12, 2013, Plaintiff saw Dr. Abboud, a cardiologist, for a follow up and for complaints of difficulty breathing after walking three to four blocks and dizziness and heart palpitations. *Id.* at 274-75. Dr. Abboud noted that Plaintiff was complying with his prescriptions, but was still including salt in his diet against medical advice. *Id.* at 275. A detailed exam showed no respiratory distress or chest pain, and normal musculoskeletal findings. *Id.* at 276-77. Dr. Abboud ordered that the Plaintiff continue his prescribed treatment. *Id.* at 280.

Plaintiff had follow up appointments at Brooklyn Hospital with Dr. Al-Izzi on September 3, 2013 (*Id.* at 249-57) and October 11, 2013 (*Id.* at 234-48), and Dr. Abboud on November 18, 2013 (*Id.* at 264-71), and Plaintiff's physical examination findings continued to be unremarkable with regular heart rate and rhythm, normal joint range of motion and no swelling or decreased strength, and clear lungs with no difficulty breathing.

### 2. *Consultative Examination*

Benjamin Kropsky, M.D., performed a consultative examination of Plaintiff on January 5, 2012. *Id.* at 224. Dr. Kropsky noted that Plaintiff reported suffering from shortness of breath after walking four to five blocks or climbing one flight of stairs and experiencing lightheadedness and dizziness. *Id.* Dr. Kropsky also noted that Plaintiff reported having an abnormal cardiac rhythm, but that Plaintiff had no specific cardiac diagnosis. *Id.* Plaintiff told Dr. Kropsky that he experiences chest pain and has had hypertension since 2007, though Plaintiff's hypertension is controlled with medication. *Id.* Plaintiff reported occasional pain in both of his ankles from

6

previous fractures, and having the left ankle repaired with screws and plates. *Id.* The ankle pain limits Plaintiff's ability to walk for prolonged periods. *Id.* Plaintiff also reported to Dr. Kropsky that his right hand occasionally "locks" and he has periodic numbness in both hands. *Id.* At the time of the examination, Plaintiff was smoking approximately one pack of cigarettes and drinking a six pack of beer and two shots of liquor each day. *Id.* at 225. However, Plaintiff was able to perform all tasks of daily living independently, including showering, bathing, and dressing himself. *Id.* at 224-25. Dr. Kropsky noted that Plaintiff's activities included watching television, listening to the radio, and walking outside. *Id.* at 225. Plaintiff does not care for any children, cook, clean, or do laundry. *Id.*

Plaintiff was in no acute distress during the examination. *Id.* He walked with a mild limp favoring the right leg, and had a slightly waddling gait. *Id.* He was able to walk on his toes and heels with difficulty, but had a full squat and a normal stance, and used no assistive devices. *Id.* Plaintiff required no assistance with changing clothes for the exam or help getting on and off the exam table. *Id.* at 225-26. He could also rise from a chair without difficulty. *Id.* at 226.

Dr. Kropsky noted that Plaintiff's lungs were clear to auscultation and percussion, and Plaintiff had a normal heart rhythm with no murmur, gallop, or rub audible. *Id.* Plaintiff's cervical and lumbar spine showed a full range of motion, with no abnormalities in the thoracic spine. *Id.* Straight leg testing in the right leg was to 45 degrees leading to pain in the thigh, and straight leg testing in the left leg was to 60 to 70 degrees leading to pain in the thigh. *Id.* Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, knees, and hips. *Id.* Plaintiffs ankles had full plantar flexion, but decreased dorsiflexion. *Id.* His joints were stable and non-tender, with no redness, heat, swelling, or effusion. *Id.* Plaintiff's grip was five out of five, and his finger dexterity was intact. *Id.* at 227. Plaintiff had no sensory deficit. *Id.*

Dr. Kropsky requested a pulmonary function test, which revealed a mild obstruction and low vital capacity both before and after the administration of bronchodilators. *Id.* Plaintiff's total forced vital capacity ("FVC") before and after the bronchodilators was 3.21 and 3.38, respectively. *Id.* at 229-30. Plaintiff's forced expiratory volume ("$FEV_1$") before and after the bronchodilators was 2.25 and 2.35, respectively. *Id.*

Dr. Kropsky diagnosed Plaintiff with: (1) dyspnea and mild obstructive pulmonary disease, "probably" secondary to early chronic obstructive pulmonary disease ("COPD"); (2) dizziness of uncertain etiology; (3) possible intermittent cardiac arrhythmia; (4) intermittent numbness and stiffness in his hands of uncertain etiology; and (5) hypertension. *Id.* at 227. Plaintiff's prognoses for these diagnoses is fair, with the exception of the hypertension, which has a prognosis of good. *Id.* Dr. Kropsky's medical source statement indicates that Plaintiff has a mild limitation for prolonged walking and climbing stairs, secondary to shortness of breath and lightheadedness. *Id.* The medical source statement further notes that Plaintiff should avoid dust, smoke, and other known respiratory irritants, and that he may have additional limitations after cardiac findings and further testing. *Id.*

## C. Hearings Before the ALJ

At the June 18, 2013 hearing, the ALJ advised Plaintiff of his right to counsel, including that representation would be at no cost to him unless he won. *Id.* at 48-50. Plaintiff indicated that he wanted the opportunity to obtain counsel, and the ALJ adjourned the conference for that purpose. *Id.* at 51. Before closing the hearing, the ALJ noted the sparse medical record, obtained

a medical release form from the Plaintiff, confirmed the names of Plaintiff's treating physicians, and indicated that he would request additional medical records. *Id.* at 52-58.

On October 10, 2013, the ALJ reopened the hearing. *Id.* at 21. Though Plaintiff had nearly four months to obtain counsel, he failed to take any steps to do so, and offered no extraordinary circumstances preventing him from obtaining counsel. *Id.* at 21-23. Therefore, the ALJ decided to proceed with the hearing. *Id.* at 23. Before proceeding, the ALJ noted that he had not received any additional medical records. *Id.* at 24. Even though the hearing had been postponed since June, the ALJ still only had "about 25 pages" from Brooklyn Hospital. *Id.* at 26. Plaintiff testified that he was still a patient at Brooklyn Hospital, and he had been seeing several doctors there once every two or three months for a number of years. *Id.* at 24, 37.[5]

Plaintiff testified that he had not worked since May 2007. *Id.* at 28. When he did work, it was "off the books," and his last job was as a furniture store delivery person in 1987. *Id.* Plaintiff left that job "mainly because [he] couldn't keep working," but the store that employed him had also closed. *Id.* at 29. Plaintiff testified that the job included lifting furniture weighing over 100 pounds with another person's assistance. *Id.* at 30-31.

Plaintiff testified that he spends most of his time "lounging around." *Id.* at 33. He testified that he has a heart problem, shortness of breath when he exerts himself, hypertension, and also suffers from numbness in his hands. *Id.* at 34, 38. Additionally, he has been smoking for twenty years and has a drinking problem. *Id.* at 35. Plaintiff broke both of his ankles in 2007, and had his left ankle repaired with screws and a plate. *Id.* The ankle injuries affect Plaintiff's walking and standing "sometimes; not all the time." *Id.* Plaintiff has also been told that he might have

---

[5] The record indicates that the ALJ received additional medical records from Brooklyn Hospital after the hearing, but before issuing his decision. *See* R. at 233-87.

9

emphysema and that he likely has early COPD, and, therefore, he should avoid lung irritants. *Id.* at 37, 39.

## DISCUSSION

A.     **Standard of Review**

Unsuccessful Social Security disability benefits claimants may seek judicial review of the Commissioner's denial of their benefits in the district court "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). In reviewing the final determination of the Commissioner, the district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (internal citations and quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 1990)) (internal quotation marks omitted).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remanding to the Commissioner is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp.2d 559, 568 (E.D.N.Y. 2004). A remand is also appropriate "[w]here there

are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 82-83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)) (internal quotation marks omitted). "[I]t is the rule in [the Second] [C]ircuit that the [social security] ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (quoting *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999)).

**B.     Disability Claims**

A claimant must be disabled to receive disability benefits under the Act. *See* 42 U.S.C. §§ 423(a), (d). A claimant is disabled if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can . . . be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof in establishing that he is disabled. Disability must be established through medical and other evidence that the Commissioner may require, presented as "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, [] show[ing] the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities" that could reasonably produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A).

In determining whether a claimant is disabled under the Act, the ALJ must perform a five-step inquiry. 20 C.F.R. § 404.1520(a)(4). At the first step, the claimant is not disabled if he is performing "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the ALJ considers, without respect to age, education, or work experience, whether the claimant's impairment is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). Impairments are severe when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20

C.F.R. § 404.1520(c). At the third step, the ALJ will determine whether the impairment or combination of impairments meets or medically equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("the Listings"). *See* 20 C.F.R. §§ 404.1520(a)(iii), (d). If no impairment exists, the ALJ then makes a finding about the claimant's residual function capacity ("RFC"). 20 C.F.R. § 404.1520(e). At step four, a claimant is not disabled if he can perform past relevant work, 20 C.F.R. § 404.1520(a)(iv), and at step five, the ALJ determines whether the claimant could perform other work existing in the national economy in significant numbers, considering claimant's age, education, and prior work experience. 20 C.F.R. §§ 404.1520(a)(v), (e), (f).

**C.     The Decision**

On August 8, 2014, the ALJ issued a decision denying Plaintiff's claims. R. at 9-16. The ALJ performed the necessary five-step inquiry in determining that Plaintiff had the RFC required to perform light work and, therefore, was not disabled. *Id.* at 11-15. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 10, 2011, the alleged onset date of disability. *Id.* at 11. At the second step, the ALJ found the following severe impairments: COPD, hypertension, non-ischemic cardiomyopathy, status post open reduction internal fixture ("ORIF") with screws and plates in the left ankle due to fracture, and alcohol abuse. *Id.* At the third step, the ALJ concluded that Plaintiff's impairment did not meet or medically equal any impairments included in the Listings, specifically noting that Plaintiff did not meet the criteria for Listing 3.02 (chronic pulmonary insufficiency) or 1.02 (major dysfunction of a joint). *Id.* at 12.

The ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), including lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing, walking, and/or sitting for six hours in an eight-

hour workday with regular breaks; and occasionally climbing stairs, but not ladders. *Id.* at 12-14. The ALJ accorded some weight to the consultative examiner's opinion, and found that the Plaintiff's allegations and testimony were not entirely credible because: the claimed impairments did not significantly interfere with Plaintiff's ability to function on a daily basis; Plaintiff could get around by himself without difficulty, including by using public transportation; Plaintiff's conditions were being managed by medications; and physical examinations during the relevant period were within normal limits. *Id.* at 14. The ALJ also found that Plaintiff should avoid concentrated exposure to respiratory irritants. *Id.*

At the fourth step, the ALJ found that Plaintiff had no past relevant work. *Id.* at 15. At the fifth step, in consideration of Plaintiff's "age, education, work experience, and residual functional capacity," the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform" according to the applicable Medical-Vocational Guidelines at 20 C.F.R. § 404.969. *Id.*

**D. Analysis**

The Commissioner moves for judgment on the pleadings, seeking affirmance of the denial of Plaintiff's benefits on the grounds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled and that the Commissioner applied the correct legal standard. *See generally* Def.'s Mem. The Court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). Accordingly, the Court interprets the Complaint "to raise the strongest arguments that [it] suggest[s]." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis omitted); *Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 146 (2d

Cir. 2002). Upon review of the record, the Court finds that the ALJ applied the correct legal standards and his decision is supported by substantial evidence. Accordingly, for the reasons set forth below, the denial of benefits is affirmed.

### 1. *The ALJ Adequately Developed the Record*

The ALJ has "an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d. Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). In the Second Circuit, "the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal quotation marks omitted). This obligation exits "'even when the claimant is represented by counsel . . . .'" *Rosa*, 168 F.3d at 79 (internal quotation marks and citation omitted). The obligation includes "seek[ing] additional information from [the treating physician] *sua sponte*, *Shaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998), and making "every reasonable effort" to get the required medical documentation, 20 C.F.R. § 416.912(b)(1).[6]

Here, the ALJ sufficiently developed the administrative record. Plaintiff indicated at the initial hearing that he was being treated by Brooklyn Hospital, specifically Dr. Abboud, Dr. Sherkovich, and Dr. Al-Izzi. *See* R. at 54-55, 185. At the time of the initial hearing, Plaintiff's medical records were incomplete. The ALJ noted that Plaintiff's medical records consisted only of roughly twenty-five pages spanning from 2007 to 2011. *Id.* at 52-54. The ALJ adjourned the initial hearing so that Plaintiff could attempt to secure a representative and the ALJ agreed to request additional records from Brooklyn Hospital. *Id.* at 55-56 ("We'll ask [Brooklyn Hospital] for the records.").

---

[6] "Every reasonable effort" is defined as making an initial request, followed by a follow-up request between ten and twenty days after the initial request. 20 C.F.R. § 416.912(b)(1)(i).

The record indicates that the ALJ submitted record requests to Drs. Al-Izzi and Abboud, and received records from Brooklyn Hospital covering the period from June 2013 through November 2013. *Id.* at 233-87. Given the ALJ's efforts to develop the medical record following the first hearing, and the presence of additional medical records from Plaintiff's treating physicians following the ALJ's requests, the Court finds that the ALJ adequately developed the record. *See Thomas v. Barnhart*, 2002 WL 31433606, at *5 (S.D.N.Y. Oct. 30, 2002) ("This case is not one where the ALJ set his own expertise against that of the treating physician or rejected the treating doctor's findings before attempting to fill any possible gaps.").

### 2. *Substantial Evidence Supports the ALJ's Decision*

Substantial evidence in the record supports the ALJ's decision at every step. The record supports the ALJ's determination that Plaintiff had not been engaged in substantial gainful activity. Plaintiff testified that he had not worked since May 2007, well before the alleged onset of disability in November 2011. *See* R. at 28. The record also supports the ALJ's determination that the Plaintiff suffered from severe impairments of COPD (e.*g.*, *Id.* at 227, 229-31), hypertension (e.*g.*, *Id.* at 249), non-ischemic cardiomyopathy (e.*g.*, *Id.* at 246), status post open reduction internal fixture (ORIF) with screws and plates in the left ankle due to fracture (e.*g.*, *Id.* at 2245-25), and alcohol abuse (e.*g.*, *Id.* at 279); Plaintiff's impairments are well-documented throughout his medical records. Moreover, Plaintiff's testimony regarding these impairments is consistent with his medical records. *Id.* at 34-39.

Substantial evidence also supports the ALJ's determination that Plaintiff's impairments did not meet or medically equal the criteria of Listings 1.02 (major dysfunction of a joint) and 3.02 (chronic pulmonary insufficiency). Section 1.02 of the Listings is "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable

15

imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. Such deformity must involve either "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively,"[7] or "one major peripheral joint in each upper extremity (i.e. shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively." *Id.*

Here, the record reflects that Plaintiff has the ability to ambulate effectively without the use of assistive devices. Plaintiff reported taking public transportation and walking alone in order to travel places, and he does not use any assistive devices to ambulate. *See, e.g.*, R. at 165, 172, 225. Plaintiff also reported being able to climb two flights of stairs before needing to rest, walking two blocks before needing to rest, and doing at least some walking daily. *Id.* at 168-69, 172. Furthermore, the record does not indicate that Plaintiff's numbness in his hands resulted in an inability to perform fine and gross movements, as his hand and finger dexterity and grip strength was intact. *Id.* at 227. Therefore, the ALJ properly determined that Plaintiff's impairments did not meet the requirements of Listing 1.02. *Id.* at 12.

Section 3.02 of the Listings uses spirometry results to determine whether an impairment meets or medically equals the requirements of the Listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(E)(1). A plaintiff's highest $FEV_1$ value is used to establish a severe impairment under Listing 3.02A, and a plaintiff's highest FVC value is used to establish a severe impairment under Listing 3.02B. *Id.* Here, Plaintiff is 71 inches tall without shoes (R. at 147, 229), and, therefore, his $FEV_1$

---

[7] Ineffective ambulation is defined as "the inability to walk without the use of a walker, two crutches or canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

must be less than or equal to 1.85,[8] and his FVC must be less than or equal to 2.30[9] to meet the requirements of Listings 3.02A and 3.02B, respectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 3.02A, 3.02B.

Plaintiff's pulmonary function test results indicate that his respiratory impairments do not meet or medically equal the requirements of the Listings. Plaintiff's $FEV_1$ was 2.25 and 2.35 before and after the administration of bronchodilators, respectively, which is above the required level of 1.85. *See* R. at 229. Similarly, Plaintiff's FVC was 3.21 and 3.38 before and after the administration of bronchodilators, respectively, which is above the required level of 2.30. *Id.* Accordingly, the ALJ correctly determined that Plaintiff's impairments did not meet or medically equal the requirements of Listings 3.02A and 3.02B. *Id.* at 12.

Substantial evidence also supports the ALJ's determination that Plaintiff had an RFC for a light range of work,[10] with the ability to occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, sit up to six hours, and stand or walk for up to six hours in an eight-hour work day. *Id.* at 12-15. The ALJ followed the two-step process of (1) determining whether there is an underlying medically determinable physical or mental impairment that would be expected to produce the Plaintiff's pain or symptoms and (2) then evaluating the intensity, persistence, and

---

[8] The ALJ's decision claims that Plaintiff's $FEV_1$ must be less than or equal to 1.65 (R. at 12), and the Commissioner argues that Plaintiff's $FEV_1$ must be less than or equal to 1.55 (Def.'s Mem. at 13). For males over the age of twenty and seventy-one inches tall, Listing 3.02A requires an $FEV_1$ of 1.85 or less. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A. Regardless, Plaintiff's $FEV_1$ is well above either measure. *See* R. at 229 (Plaintiff's $FEV_1$ was 2.25 and 2.35).

[9] Defendant claims that Plaintiff's FVC must be less than or equal to 1.75. Def.'s Mem. at 13. For males over the age of twenty and seventy-one inches tall, Listing 3.02B requires an FVC of less than or equal to 2.30. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02B. Plaintiff's FVC is well above both measures. *See* R. at 229 (Plaintiff's FVC was 3.21 and 3.28).

[10] "Light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

limiting effects of the Plaintiff's symptoms and determine the extent to which they limit Plaintiff's functioning. *Id.*

The ALJ properly accorded some weight to the opinion of the consultative examiner Dr. Kropsky, who opined that Plaintiff had a mild limitation for prolonged walking and climbing stairs, and, because of Plaintiff's respiratory symptoms, Plaintiff should avoid respiratory irritants. *Id.* at 13, 227. Dr. Kropsky's examination revealed normal ranges of motion in the cervical and lumbar spine, no sensory deficit, full muscle and grip strength, intact hand and finger dexterity, and clear lung sounds. *Id.* at 226-27. A pulmonary function test performed at Dr. Kropsky's request showed a minor respiratory obstruction following the use of bronchodilators. *Id.* at 227, 229-31. Therefore, Dr. Kropsky's opinions are supported by his examination findings.

The ALJ's RFC determination is also supported by the treatment records from Brooklyn Hospital. Plaintiff's treatment records do not note any acute distress, and the records show normal cardiovascular, respiratory, musculoskeletal, and neurological findings. *See, e.g.*, *Id.* at 14, 238-39, 253-54. Plaintiff's physical examination findings during the relevant period were generally within normal limits, a stress test was negative for myocardial ischemia, and an x-ray was negative for acute pulmonary disease. *Id.* at 220, 253-54, 279, 281.

The ALJ also considered Plaintiff's testimony regarding his alleged symptoms and functional limitations. *Id.* at 13-15. The ALJ found Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms was not entirely credible. *Id.* As the Commissioner notes, subjective symptomatology alone cannot be a basis for disability. Def.'s Mem. at 16; 20 C.F.R. § 416.929(a). Generally, "it is the function of the ALJ, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the

claimant.'" *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

While Plaintiff reported that he has been unable to work since May 2007 because of his symptoms, he also reported that he is able to care for himself independently, including cleaning, showering, bathing, and dressing himself. *See* R. at 14, 163. Plaintiff further reported that he is able to perform household chores, such as cleaning and household repairs with some assistance when he gets tired. *See Id.* at 165. According to Plaintiff, he also walks daily, and is able to take public transportation without assistance. *Id.* at 165, 172. Additionally, Plaintiff's physical examination results during the relevant period were within normal limits. *See, e.g.*, *Id.* at 238-39, 253-54. Therefore, given that Plaintiff's medical record and social security application contradict his claimed disabilities, the ALJ did not err in finding Plaintiff to be less than credible.

Finally, the ALJ correctly determined that jobs existed in significant numbers in the national economy that Plaintiff can perform. Since Plaintiff had no past relevant work experience, the ALJ proceeded to step five and considered Plaintiff's RFC, in conjunction with his age, education, and work experience, to determine whether jobs existed in the national economy in significant numbers that Plaintiff could perform. *See Id.* at 15. Ordinarily, "the Commissioner meets his burden at the fifth step 'by resorting to the applicable medical vocational guidelines (the grids).'" *Rosa*, 168 F.3d at 78.

Here, the ALJ's reliance on the "grids" was proper given that Plaintiff retained the RFC for light work, and Plaintiff's non-exertional limitations for not climbing ladders and avoiding lung irritants do not significantly erode his occupational base. *See* SSR 83-14 ("Relatively few jobs in the national economy require ascending or descending ladders and scaffolding."); SSR 85-15 ("Where an individual has a medical restriction to avoid excessive amounts of noise, dust, etc.,

the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc."). Since Plaintiff was a "younger person" at the time of the ALJ's decision, with the ability to communicate in English, a limited education, and no relevant work history, the ALJ properly relied on Grid Rule 202.17 in determining that Plaintiff was not disabled. *See* R. at 15; *Rosa*, 168 F.3d at 82 ("'For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled.'"). The ALJ's determination is supported by substantial evidence in the record.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted, and Plaintiff's appeal is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
      March 29, 2018

/s/
DORA L. IRIZARRY
Chief Judge